[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-14185

_____

TAMMIE L. TERRELL,

Plaintiff-Appellant,

*versus*

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cv-00064-WFJ-AEP

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

ROSENBAUM, Circuit Judge:

Plaintiff-Appellant Tammie Terrell, who is African-American, applied but was not selected for a Chief Nurse position at the James A. Haley Veterans' Hospital (the "Tampa VA Hospital"). Terrell sued the Secretary of Veterans Affairs under Title VII, alleging (1) race and national-origin discrimination, both in her non-selection and the hiring process; (2) retaliation; and (3) a discriminatory and a retaliatory hostile work environment. The district court granted summary judgment for the Secretary on all counts. After careful consideration, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

Terrell has worked as a nurse at the Tampa VA Hospital since 1998. In 2012, Terrell became Nurse Manager of the Haley Cove Community Living Center ("CLC"), which functions like a nursing home. Later, Terrell applied for the role of CLC Chief Nurse but was not selected. That selection process is the subject of this litigation.

### A.    Factual Background

#### 1.  CLC Chief Nurse Hiring Process

In 2015, CLC Chief Nurse Dr. Inez Joseph retired, leaving her position vacant. Terrell believed that Dr. Joseph had

"groomed" Terrell to take over the Chief Nurse role, as Terrell assisted with Chief Nurse duties and attended Chief Nurse meetings with Dr. Joseph. But Dr. Joseph could not choose her successor; rather, that responsibility fell to Chief Nurse Executive Laureen Doloresco.

Doloresco had ultimate decision-making authority, but she delegated much of the hiring process to other hospital employees. First, Doloresco's administrative officer, Jessica Ferraro, rated each résumé based on education, relevant certifications, assistant-nurse-executive experience, long-term-care management or leadership experience, nurse-manager experience, and veteran status. Then, a four-member panel interviewed the top-rated candidates, asking the same questions and using the same scoring criteria. The panelists were (1) Cary Burcham, Chief Nurse of Acute Care; (2) Thomas Eingle, Chief of Pharmacy; (3) Carol McFarlane, Assistant Chief of Social Workers; and (4) Dr. Inna Sheyner, CLC Medical Director. McFarlane is Black, but all other panelists are white.

According to the Chief Nurse job posting, preference would be given to candidates with a Nurse Executive certification and "[p]rior leadership experience that demonstrates ability to manage a complex nursing section with diverse programs." Doloresco believed "leadership skills [were] the key," more so than "clinical experience," when selecting a Chief Nurse.

### 2. First Round of Applications

More than seventy candidates applied. The panel interviewed the top ten candidates, including Terrell. Terrell received

the highest interview score but the eighth-highest résumé score, because she did not have relevant certifications and had only three years of nurse-manager experience.

In computing the scores, Ferraro made two administrative errors. First, she jumbled Dr. Sheyner's scores for seven of the ten interviewees, including Terrell. Ferraro recorded Terrell's score from Dr. Sheyner as 27 points, when Dr. Sheyner had in fact given Terrell 35 points. Second, Ferraro mistakenly excluded Burcham's scores in calculating each candidate's average interview score. So Terrell's average interview score was listed as 33 points when it should have been 34 points. The parties apparently did not realize this error until discovery in this case.

After interviews concluded, Doloresco asked for a "comparison grid of the candidates that were interviewed" with their "education, prior years of supervisory experience, progressive management experience, and any other key qualifications." In that email, Doloresco commented, "Some folks do very well in interviews, but don't possess the progressive management experience and track record that is needed for a Chief Nurse position."

Burcham sent Doloresco a summary of the top four candidates' qualifications, which included Terrell's. Notably, Terrell had 6 years of management experience, but the other top candidates had 8, 17, and 24 years of management experience. Terrell also lacked executive-level experience, which the other three top candidates had. And Terrell had no leadership certifications, but two of the other top candidates had multiple leadership certifications.

Before offering the Chief Nurse role to another candidate, Doloresco met with Terrell and explained that Terrell did not have enough executive experience, so she had not been selected. Doloresco recounted Terrell's "strong[] negative reaction." According to Doloresco, Terrell "left [Doloresco's] office abruptly and without discussion, seemingly angry." Around that time, Lucille Raia, Chief Nurse of Education, who was not on the panel but who was friends with Doloresco, made "comments" in front of others about Terrell's "not being qualified."

Doloresco ultimately selected Kathleen Miller, who had 17 years of management experience and the Nurse Executive certification but a lower interview score than Terrell. Miller, who is white, accepted but later withdrew. Burcham then contacted another one of the top candidates, Rita Jordan, a former Chief Nurse of another CLC. Jordan, who is Black, also received a lower interview score than Terrell. Jordan had accepted another job, so she declined Burcham's invitation to be considered. The Chief Nurse position was then reposted.

### 3. Second and Third Rounds

In the second round, more than fifty candidates applied. Terrell's résumé tied with two others for third place in the new batch. The panel interviewed three new candidates but scored them lower than most of the previous interviewees. After the interviews concluded, Burcham emailed Doloresco, "At this point, I can only endorse Ms. Terrell, but with the reservations you and I have discussed." Doloresco later attested that those "reservations"

included Terrell's "reaction to her non-selection," "relative inexperience in management," and communication issues that had arisen between Terrell and the Acting CLC Chief Nurse, Dr. Zahira Sanabria.

Doloresco and the panel decided to repost the position a third time, for internal candidates only. Only six candidates applied, two of whom (including Terrell) had previously interviewed for the position.

But this time, two of the four panelists—including McFarlane, the only Black panel member—had scheduling conflicts and could not participate in the interviews. Doloresco sought approval from Human Resources and was told the panel composition could change as long as the new panel asked the same questions and the interview scores were averaged. The new panel, which included Dr. Sanabria, did not re-interview prior candidates, only three of the four new candidates.

Doloresco ultimately selected Cheryl Stephen-Rameau, whom the panel "unanimously agree[d] on recommending." Stephen-Rameau immigrated to the U.S. from Grenada but identifies both her race and national origin as African-American. She had worked as a Nurse Manager for 14 years and had the Nurse Executive certification, as well as a medical-surgical nurse certification. Stephen-Rameau's average interview score was 33.67 points, compared to Terrell's average interview score of 34 points. Stephen-Rameau accepted and assumed the Chief Nurse role in October

2015.  She later admitted that she was told to apply for and accept the job.

### 4.  Aftermath

After Stephen-Rameau assumed the Chief Nurse role, Terrell had several interpersonal conflicts with both Stephen-Rameau and Dr. Sanabria.  In March 2016, Stephen-Rameau met with Terrell and sent her a "written confirmation of discussion."  The document described Stephen-Rameau's concerns about Terrell's behavior, including "a lack of professionalism and disrespect."  Stephen-Rameau also assigned Terrell to evaluate an employee who had filed an Equal Employment Opportunity ("EEO") complaint against Terrell.  Terrell objected, so Stephen-Rameau took over the evaluation.

As for Dr. Sanabria, she wrote an email documenting Terrell's behavior at a September 25, 2015, meeting, at which Terrell raised her voice and called Dr. Sanabria "sweetie."  When Terrell was apparently not attending leadership meetings, Dr. Sanabria wrote: "I fully support you but please remember that we need to be professionals at all times."

Stephen-Rameau was ultimately removed from the Chief Nurse role and reassigned.  Doloresco appointed Raina Rochon, who is African-American and who had formerly served as Chief Nurse of Mental Health.

Separately, after Terrell's non-selection, Raia told Terrell that Terrell "messed up" in supporting Dr. Carol Rueter, who served as bereavement coordinator in the CLC and who has a partially

paralyzed leg.  At her deposition, Dr. Rueter claimed that Raia said that she would not have hired Dr. Rueter had she known about Dr. Rueter's disability.  Dr. Rueter filed a grievance against Raia for using foul language at work and other matters.  But Terrell never reported discrimination against Dr. Rueter or refused to take any action she viewed as discriminatory.

Terrell alleges two additional incidents related to Dr. Rueter. First, in their meeting regarding Terrell's non-selection, Doloresco asked Terrell what Dr. Rueter's role was in the CLC, to which Terrell did not respond.  Nothing in the conversation mentioned or alluded to Dr. Rueter's disability.  Second, Acting Chief Nurse Dr. Sanabria asked Terrell to move Dr. Rueter's belongings to another office after Terrell had moved Dr. Rueter to accommodate displaced employees.

### B. Procedural History

After Doloresco announced Stephen-Rameau's selection, Terrell filed an EEO complaint.  Terrell alleged in her discrimination complaint that "she was not considered for promotion to [Chief Nurse] because she is African American and the individual selected for the position is of Caribbean descent."  And, she claimed, Burcham "has a history of promoting employees of Caribbean descent" with Doloresco's approval.

After exhausting her administrative remedies, Terrell filed a Title VII action in federal court against the Secretary.  Terrell asserted three claims: (1) race and national-origin discrimination, (2) retaliation for protected EEO activity, and (3) hostile work

environment.  She sought back pay and other monetary damages, as well as a prospective injunction prohibiting the Tampa VA Hospital from engaging in discrimination.

The Secretary moved for summary judgment.  Terrell opposed that motion.  The district court granted the Secretary's motion on all counts.  In its order, the district court held that Terrell's race and national origin were not but-for causes of any differential treatment in the hiring process, including the candidate scoring, interview panel composition, and ultimate non-selection.  And it found that the facts, even viewed most favorably to Terrell, did not support either a retaliation or hostile-work-environment claim.

Terrell timely appealed.  Over three months later, Terrell filed a motion for relief from judgment, *see* Fed. R. Civ. P. 60(b), citing newly discovered evidence that the Secretary allegedly failed to produce in discovery.  The district court denied Terrell's motion. It found that Terrell was "improperly attempting to relitigate, or have [the] Court reconsider, her case . . . which Rule 60(b) does not condone."

Again, Terrell timely appealed.  On appeal, she challenges both the district court's grant of summary judgment and denial of her Rule 60(b) motion.

## II.    STANDARD OF REVIEW

We review a grant of summary judgment de novo, "viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th

Cir. 2022) (citation and internal quotation marks omitted). We review a district court's denial of a Rule 60(b) motion for abuse of discretion. *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1316 (11th Cir. 2000).

## III.    DISCUSSION

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). An issue is genuine if a reasonable trier of fact could return judgment for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and is not "irrelevant or unnecessary." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Id.* at 252. Contentions based on "mere speculation and conjecture" cannot defeat summary judgment. *Cincinnati Ins. Co. v. Metro. Props., Inc.*, 806 F.2d 1541, 1544 (11th Cir. 1986).

Here, we conclude that the district court properly granted summary judgment to the Secretary on each of Terrell's claims. Even viewing the evidence in the light most favorably to Terrell, as we are bound to do, Terrell can point to no genuine dispute of material fact as to whether she experienced race or national-origin discrimination, retaliation, or a hostile work environment.

### A. Summary judgment was proper on Terrell's race-and-national-origin-discrimination claims.

We begin with Terrell's race-and-national-origin-discrimination claims related to her federal employment. Under Title VII's federal-sector provision, "[a]ll personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race . . . or national origin." 42 U.S.C. § 2000e-16(a).[1]

We recently clarified the "breadth of the phrase 'free from any discrimination.'" *Buckley v. Sec'y of Army*, 97 F.4th 784, 793 (11th Cir. 2024) (quoting 42 U.S.C. § 2000e-16(a)). Namely, we held that "the 'free from any discrimination' language means that personnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic." *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199 (11th Cir. 2021) ("*Babb II*") (quoting *Babb v. Wilkie*, 589 U.S. 399, 406 (2020) ("*Babb I*")). So "a federal employer violates [Title VII] if it allows race [or national-origin] discrimination to contribute to any personnel action," even

---

[1] By contrast, Title VII's private-sector provision prohibits personnel action against an employee "because of such individual's race, . . . national origin," or other protected characteristic. 42 U.S.C. § 2000e-2(a)(1). In other words, the private-sector provision "requires a showing that race was the but-for cause of the challenged personnel action." *Buckley v. Sec'y of Army*, 97 F.4th 784, 792 n.7 (11th Cir. 2024); *see also Babb v. Wilkie*, 589 U.S. 399, 410 (2020) (describing "because of" as "but-for causal language"). We have acknowledged the "significant textual differences" between the two provisions. *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 833 (11th Cir. 2021).

if that discrimination was not the but-for cause of the ultimate decision. *Buckley*, 97 F.4th at 793.

Here, that means that Terrell can substantiate a Title VII violation if she shows that race or national-origin discrimination "tainted" the hiring process, even if it was not the but-for cause of her non-selection. *See Babb II*, 992 F.3d at 1199. But "even if [Terrell] proves that race [or national-origin] discrimination tainted the decision-making process, she is not necessarily entitled to all remedies under § 2000e-16(a)." *Buckley*, 97 F.4th at 794. That's because "relief must redress" the precise injury that the alleged discrimination "inflicted." *Id.*

Specifically, if Terrell proves that race or national-origin discrimination was (or both were) a but-for cause or causes of her non-selection, she may be entitled to retrospective relief, like compensatory damages and back pay. *See id.* On the other hand, if Terrell proves only that discrimination "tainted" the hiring process but not that it was a but-for cause of her non-selection, she is not entitled to damages stemming from her non-selection. Rather, the court "begin[s] by considering injunctive or other forward-looking relief." *Id.* (internal quotation marks omitted) (quoting *Babb II*, 992 F.3d at 1205 n.8).

As for Terrell's burden of proof, she is not bound by the *McDonnell Douglas*[2] burden-shifting framework, as we no longer apply that framework for federal-sector claims. *See id.* But she still

_____

[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

must proffer "evidence that her race" or national origin "play[ed] *any* part" in the hiring process.  *Id.* (alteration in original) (quoting *Babb I*, 589 U.S. at 406).  Terrell has not met that burden here.

To begin, Terrell has not created a genuine issue of material fact as to whether her race or national origin was (or both were) a but-for cause or causes of her non-selection.  Terrell presents no direct evidence of race or national-origin discrimination.  She relies instead on circumstantial evidence, namely, the fact that Doloresco offered the Chief Nurse job to a candidate of a different race (white) and then to a candidate of Terrell's race (Black) but a different national origin (Grenadian).  Terrell herself testified that discrimination was "the only thing [she] could think of" to explain her non-selection but that she had not experienced any derogatory remarks or actions regarding her race or national origin.

For instance, Terrell points to discrimination claims that other employees filed against Doloresco related to distinct hiring decisions, as purported Rule 404(b) evidence of intent to discriminate.  *Cf. Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286 (11th Cir. 2008); Fed. R. Evid. 404(b).  But given the absence of record evidence otherwise, these discrimination cases against Doloresco do not create a genuine issue of material fact as to whether discrimination occurred in Terrell's case.

Terrell also relies on a union leader's declaration that 30% of the nurses at the Tampa VA Hospital were Black or Asian, but only 6 of the 51 Assistant Nurse Managers and Nurse Managers were Black or Asian.  Terrell does not cite statistics for Chief Nurses.

Because Terrell's claims concern the selection process for Chief Nurse, not Nurse Manager, these statistics are not "sufficiently compelling" in the context of Terrell's case, under our precedent. *See Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir. 1985); *see also Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1159 n.7 (11th Cir. 2021) ("even in . . . circumstantial evidence discrimination cases, the data must have some nexus to the parties"); *Smith v. Horner*, 839 F.2d 1530, 1536 n.8 (11th Cir. 1988) ("statistics alone cannot establish a prima facie case of individual disparate treatment"). And because the Chief Nurse position was not "entry level" but instead "require[ed] special skills," the statistics do not necessarily reflect "the number of [nurses] qualified to undertake" the Chief Nurse role. *See Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1554 (11th Cir. 1994). So without more, these statistics do not create a genuine issue of material fact with respect to race or national-origin discrimination.

The district court rejected Terrell's circumstantial arguments. It found that Terrell's race-discrimination claim necessarily "must fail" because another Black woman was ultimately selected. We disagree with this reasoning. The fact that the position was ultimately offered to another individual of the same race does not automatically preclude Terrell's race-discrimination claim, particularly with respect to Miller's initial selection. But we will affirm the grant of summary judgment "if the result is correct, even if the court relied upon an incorrect ground or gave a wrong reason." *J.F.K. v. Troup Cnty. Sch. Dist.*, 678 F.3d 1254, 1255 (11th Cir. 2012)

(quoting *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263–64 (11th Cir. 2010)).

And here, no record evidence supports the notion that race or national-origin discrimination against Terrell was a but-for cause of her non-selection. Rather, the record indicates that Doloresco selected both Miller and Stephen-Rameau based on their management experience and certifications, which she valued more than an interview score. It is not our role to second-guess an employer's hiring criteria—indeed, an employer may act "for a good reason [or] a bad reason" so long as it is not an unlawful reason. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (citation and internal quotation marks omitted). Whether Doloresco's preference for management experience and certifications was "good" or "bad," *id.*, it was not race or national-origin discrimination. So because Terrell has not shown but-for causation, she cannot seek damages for her non-selection.[3] *See Buckley*, 97 F.4th at 794.

---

[3] Terrell contends that the district court should have applied the burden-shifting framework from *Texas v. Lesage,* 528 U.S. 18, 20–22 (1999), and *Mt. Healthy County Board of Education. v. Doyle*, 429 U.S. 274, 285–87 (1977), which would require the Secretary to prove that he would have made the same hiring decision without consideration of Terrell's race or national origin. But that framework applies in constitutional cases, not Title VII cases. As we've discussed, *Babb I* and *II* supply the applicable standard. And in any case, the record supports the conclusion that the Secretary would have made the same hiring decision without consideration of Terrell's race or national origin. What's more, as we discuss later in this opinion, nothing indicates that the Secretary allowed race or national-origin discrimination to taint the decision-making process.

Terrell's claim of differential treatment in the hiring process fares no better. In addition to her non-selection, Terrell takes issue with (1) Ferraro's scoring errors, (2) the panelist changes for the third round of interviews, and (3) Stephen-Rameau's "pre-selection."

First, Terrell alleges Ferraro "made what a jury could find were intentional errors to lower the difference in scores between Terrell and other candidates." But in the first round, even after the scoring errors, Terrell retained the highest interview score. In other words, the scoring errors did not cause Terrell to receive a lower interview score than Miller. And more importantly, the scoring errors affected *all* candidates, not just Terrell or not only candidates of a particular race. Nor were interview scores dispositive—Doloresco expressed her preference for management experience over interview performance. The errors, then, do not create a genuine issue of material fact as to differential treatment in the hiring process.

Second, the change in panel composition did not disadvantage Terrell (or advantage another candidate). To be sure, the removal of a hiring panel's only Black member could, under other circumstances, support an inference of race discrimination. But here, McFarlane had scheduling conflicts and requested to be removed from the panel. And the two panelists who had given Terrell the highest interview scores remained on the panel. What's more, Terrell retained her prior interview scores, and as discussed above, Doloresco did not base her decision on interview scores

alone. This was not a case where "established rules were bent or broken to give a non-minority [or any] applicant an edge in the hiring process." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998). While a consistent panel would have been ideal, we cannot say that, on these facts, the change in panel composition rises to the level of differential treatment based on race or national origin.

Third and finally, though the record suggests that Stephen-Rameau was "pre-selected," nothing indicates that race or national origin factored in any way into Stephen-Rameau's selection (or Terrell's non-selection). Again, Stephen-Rameau had fourteen years of Nurse Manager experience (compared to Terrell's three) as well as the Nurse Executive certification (which Terrell lacked). And Stephen-Rameau's average interview score was only 0.33 points lower than Terrell's average interview score. We express no opinion on whether Stephen-Rameau was the "right" choice, but the record does not allow us to conclude that her selection was a discriminatory choice.

To be sure, "the presence of [non-pretextual] reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." *Babb II*, 992 F.3d at 1204. But Terrell has not met her burden of proving either "discriminatory considerations" or their "taint." *See id*. So her claim based on differential treatment in the hiring process fails. *See Buckley*, 97 F.4th at 795.

Given the lack of evidence of race or national-origin discrimination in either the hiring process or selection, the district court properly granted summary judgment for the Secretary.

### B.  Summary judgment was proper on Terrell's retaliation claim.

Next, Terrell claims that her non-selection was unlawful retaliation for her opposition to disability discrimination against Dr. Rueter.  Like the district court, we conclude that Terrell has not created a genuine issue of material fact on this claim.

Though Title VII prohibits retaliation against private-sector employees, *see* 42 U.S.C. § 2000e-3(a), it contains no comparable provision for federal employees.  But we have long "construed § 2000e-16(a)'s prohibition of 'any discrimination' to directly 'bar[] reprisals against federal employees who file charges of discrimination.'"  *Babb II*, 992 F.3d at 1203 (quoting *Porter v. Adams*, 639 F.2d 273, 277–78 (5th Cir. 1981)).

To make a prima facie case of retaliation, Terrell must show that she (1) engaged in protected EEO activity and (2) suffered an adverse employment action, and (3) she must establish a causal link between the protected activity and the adverse action.  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  As with her discrimination claim, Terrell can establish a violation either by proving that her EEO activity was a but-for cause of her non-selection or by proving that retaliation tainted the hiring process.  *See Buckley*, 97 F.4th at 798.  But again, the remedy for each showing differs.  *See id.*

Terrell's claim fails the first prong—she did not engage in any protected EEO activity that could form the basis for retaliation. Terrell indisputably filed an EEO complaint alleging race and national-origin discrimination *after* her non-selection, but her non-selection could not have been retaliation for not-yet-existent EEO activity.

So instead, Terrell contends that Doloresco retaliated against her based on her friendship with Dr. Rueter. Based on the record in this case, Dr. Rueter may well have faced disability discrimination—at the very least, Raia allegedly commented that she would not have hired Dr. Rueter if she had known of her disability. But Terrell admits that she took no action to oppose or protest discrimination against Dr. Rueter. She did not report it to Doloresco, Raia, or any other supervisor, file a complaint, or otherwise register her disagreement. Nor did she refuse to participate in any allegedly discriminatory activity.

The Equal Employment Opportunity Commission has defined "opposition" to include "passive resistance" or "informal" conduct, "as long as the circumstances show that the individual is conveying resistance to a perceived potential EEO violation."[4] But on this record, Terrell's friendship with Dr. Rueter, standing alone,

---

[4] U.S. Equal Emp. Opportunity Comm'n, *Questions and Answers: Enforcement Guidance on Retaliation and Related Issues* (Aug. 26, 2016), https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues [https://perma.cc/XUQ9-8GBT].

does not evince "resistance to" any discrimination. And without any outward manifestation of opposition, Terrell participated in no protected EEO activity for Doloresco and others to retaliate against. Terrell's retaliation claim cannot survive summary judgment.

### C. Summary judgment was proper on Terrell's hostile-work-environment claims.

Finally, Terrell challenges the district court's grant of summary judgment on her hostile-work-environment claims. Terrell pled both substantive and retaliatory theories of hostile work environment, the former based on race or national origin and the latter based on her friendship with Dr. Rueter as well as her post-nonselection EEO complaint.

At the outset, we emphasize that substantive hostile-work-environment claims are distinct from retaliatory hostile-work-environment claims and should be pled in separate counts. As many plaintiffs do, Terrell pled both claims in one count of her complaint. But the two causes of actions have different elements and different standards of proof. *See Tonkyro*, 995 F.3d at 836. Accordingly, the two causes of action should be pled in separate counts. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015) (explaining that complaints should "separat[e] into a different count each cause of action or claim for relief").

Terrell abandoned any challenge to the district court's ruling as to her substantive hostile-work-environment claim. A party abandons an issue when she "raises it in a perfunctory manner

without supporting arguments or authority." *Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 681 (11th Cir. 2014). Terrell's opening brief does not make any argument about her substantive hostile-work-environment claim. So we do not address that claim here.

That leaves Terrell's retaliatory-hostile-work-environment claim. Such a claim "is somewhat of a hybrid of a traditional protected-characteristic-based hostile-work-environment claim and a traditional retaliation claim." *Buckley*, 97 F.4th at 799. So we apply the framework for retaliation claims, namely, whether Terrell engaged in protected EEO activity and suffered a hostile work environment because of that activity. *See Crawford*, 529 F.3d at 970. We add one additional element: whether the work environment "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan v. Wordplay U.S., Inc.*, 955 F.3d 855, 862–63 (11th Cir. 2020); *see also Babb II*, 992 F.3d at 1207.

The district court found that Terrell "allege[d] both opposition and participation claims of retalia[ory]" hostile work environment. We take each in turn.

### 1. Opposition Claim

First, Terrell alleges a hostile work environment in retaliation for her friendship with Dr. Rueter. As discussed above, Terrell's friendship alone did not demonstrate opposition to any disability discrimination against Dr. Rueter. So Terrell did not engage in protected EEO activity that can form the basis for this claim.

But even if Terrell had engaged in EEO activity with respect to Dr. Rueter, Terrell cannot meet her burden of showing that any resulting hostility "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Monaghan*, 955 F.3d at 863. The standards for judging hostility are intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). The Supreme Court has emphasized that "a plaintiff must show that a reasonable employee would have found the challenged action *materially* adverse," separating "significant from trivial harms" such as "petty slights, minor annoyances, and simple lack of good manners." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (emphasis added). It also clarified that "[c]ontext matters," and whether an action qualifies "as retaliation will often depend on the particular circumstances." *Id.* at 69.

To support her opposition claim, Terrell relies on (1) Doloresco's question regarding Dr. Rueter's role in the CLC during their post-non-selection meeting; (2) Raia's comment that Terrell had "messed up" by supporting Dr. Rueter; and (3) Dr. Sanabria's request that Terrell move Dr. Rueter's belongings to another office.

Even taken together, Terrell cannot show that these three incidents were "materially adverse" to Terrell. *Id.* at 68. First, though Doloresco asked Terrell about Dr. Rueter's role in the CLC, she did not reference Dr. Rueter's disability or endorse any discriminatory action against Dr. Rueter. Second, Raia's comment that

Terrell had "messed up" was certainly adverse, but standing alone, it does not transcend "ordinary tribulations of the workplace" such that it "might well [have] dissuade[d]" Terrell from taking any EEO action. *See Babb II*, 992 F.3d at 1209. Finally, Dr. Sanabria's request that Terrell relocate Dr. Rueter's office to make room for other employees does not appear adverse at all, much less retaliatory or hostile. Given this evidentiary shortfall, summary judgment was proper on Terrell's opposition claim of retaliatory hostile work environment.

### 2. Participation Claim

Separately, Terrell claims that Stephen-Rameau subjected her a hostile work environment in retaliation for Terrell's EEO complaint. Terrell alleges that Stephen-Rameau "openly belittled" her, "accus[ed] her of being unprofessional," "suggested she get mental health assistance," and excluded her from leadership meetings. And according to Terrell, Stephen-Rameau "questioned [her] tour of duty, comp[ensatory] time earned, direct patient care hours, and other nursing activities."

For her part, Stephen-Rameau attested that she asked Terrell about compensatory time earned without Stephen-Rameau's knowledge because it was expected that all compensatory time and overtime be requested and approved prior to use. But Stephen-Rameau did send a written "confirmation of discussion" suggesting that Terrell consult the Employee Assistance Program to "gain more control of [her] emotions." And Terrell was not selected to attend one leadership site visit, though Stephen-Rameau attested

that was because Terrell was the "most senior" Nurse Manager in the CLC and was "expected to [remain] on site."

Regardless of whose version of the facts is correct, Terrell's retaliatory hostile-work-environment claim has a fatal flaw: Terrell has not shown that any hostility was causally connected to her EEO complaint. *See Crawford*, 529 F.3d at 970. Given this deficiency, we need not address whether Stephen-Rameau's alleged hostility "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 862–63. Rather, we affirm the district court's grant of summary judgment on this basis alone.

### D. The district court properly denied Terrell's Rule 60(b) motion.

Having addressed the district court's grant of summary judgment, we have one item more to consider: Terrell's Rule 60(b) motion. Terrell challenges the district court's denial of that motion "in a perfunctory manner without supporting arguments or authority," so she has abandoned this claim. *See Sapuppo*, 739 F.3d at 681. But even if she had not, the district court properly denied Terrell's Rule 60(b) motion.

After a notice of appeal has been filed, the district court retains jurisdiction to "entertain[] motions on matters collateral to those at issue on appeal," including Rule 60(b) motions. *Mahone v. Ray*, 326 F.3d 1176, 1179 (11th Cir. 2003). But a Rule 60(b) motion "cannot be used to 'relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of

judgment.'" *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)).

Here, Terrell filed a motion for relief from judgment based both on newly discovered evidence, *see* Fed. R. Civ. P. 60(b)(2), and fraud or misconduct by the Secretary, *see* Fed. R. Civ. P. 60(b)(3). But like the district court, we conclude that Terrell was attempting to "relitigate" her case and "present evidence" that she could have raised at the summary-judgment stage. *See Wilchombe*, 555 F.3d at 957 (quoting *Michael Linet*, 408 F.3d at 763).

### 1. *Newly Discovered Evidence*

To succeed on her Rule 60(b)(2) motion, Terrell must show that "(1) the evidence is newly discovered since the trial; (2) [s]he exercised due diligence to discover the new evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a new result." *Willard v. Fairfield S. Co.*, 472 F.3d 817, 824 (11th Cir. 2006). Terrell alleges three sources of newly available evidence: (1) a 2015 committee record; (2) a March 2018 email from Doloresco; and (3) discovery in related cases that closed after the district court issued the summary-judgment order.

First, Terrell moved for relief from the summary-judgment order based on a 2015 committee record with comparative pay grades and step levels for Terrell and Stephen-Rameau. In Terrell's view, the record demonstrates that she and Stephen-Rameau had "roughly equal" experience, so Terrell should have been selected

for the Chief Nurse role. Terrell claims she became aware of this document "on or about January 4, 2022." But the document was in Terrell's personnel file as part of the Report of Investigation, so she had access to it throughout this litigation. And the fact that Terrell and Stephen-Rameau had "roughly equal" experience for compensation purposes does not mean they were equally qualified for the Chief Nurse role, particularly given Stephen-Rameau's certifications. In other words, the record was not material. This document does not satisfy Rule 60(b)(2)'s standard.

Second, Terrell points to a March 2018 email in which Doloresco wrote,

> It is wise to develop a table to compare the candidates that you interview to show how you arrived at your selection (comparing the candidate's experience, education, interview scores, references, etc.). Keep this information, as it will be useful for you in the event a candidate who is not selected lodges a complaint.

Terrell concedes that the email "may change nothing in practice" but nonetheless argues that it "is a reactive affirmation of roles" in response to EEO claims against Doloresco. But Terrell received the email and even produced the email in another matter. This evidence is neither newly discovered nor, by Terrell's own admission, material, so it cannot support a Rule 60(b)(2) motion.

Third, Terrell relies on evidence from a failure-to-promote lawsuit by a Black Assistant Chief Nurse, Dr. Marecia Bell,[5] that allegedly "corroborates testimony . . . that Doloresco is vindictive or retaliatory." The district court found that Terrell never raised claims related to Bell on summary judgment or beforehand, so it was improper to bring them at the Rule 60(b) phase—and, alternatively, Terrell could have obtained any relevant discovery from Bell's case earlier in the exercise of diligence. We agree.

Also from Dr. Bell's case, Terrell submits Rochon's deposition testimony. Rochon's testimony does not help Terrell for two reasons: (1) Terrell had withdrawn from consideration for the Chief Nurse role by the time Rochon was selected, and (2) Terrell already raised arguments related to Rochon's selection at summary judgment. This evidence is neither material nor likely to produce a new result at trial.

In short, the district court properly denied Terrell's motion for relief from judgment under Rule 60(b)(2).

### 2. Fraud or Misconduct

To be entitled to relief under Rule 60(b)(3), Terrell must "prove by clear and convincing evidence that" the Secretary "obtained the verdict through fraud, misrepresentation, or other misconduct." *Cox Nuclear Pharm. v. CTI, Inc.*, 478 F.3d 1303, 1314 (11th

---

[5] We recently affirmed the district court's grant of summary judgment to the Secretary on Bell's race-discrimination and retaliation claims. *Bell v. Sec'y, Dep't. of Veterans Affs.*, No. 22-12698, 2024 WL 1462405 (11th Cir. Apr. 4, 2024).

Cir. 2007) (alteration adopted) (quoting *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1287 (11th Cir. 2000)). Although relief is within the discretion of the district court, Rule 60(b)(3) "is remedial and should be liberally construed." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1346 (5th Cir. 1978) (citation and internal quotation marks omitted).[6]

Terrell alleges that Doloresco fraudulently failed to produce the 2015 committee record discussed above. The district court characterized this claim as a "bald allegation" with "no facts supporting" it. We agree. Without any evidence that the document was fraudulently withheld, it cannot support relief from judgment under Rule 60(b)(3). And that is doubly so given that the record was not material to the question of summary judgment here. The district court properly denied Terrell's motion.

## IV. CONCLUSION

For the reasons we've discussed, we **AFFIRM** the district court's grant of summary judgment for the Secretary.

---

[6] All Fifth Circuit decisions prior to September 30, 1981, are binding precedent in this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).